Ladies and gentlemen, nice to see all of you again. I also want to express my appreciation for your accommodating a schedule change. The scheduling problem was mine, and I appreciate your willingness to go along with the calendar change. With that, we'll hear the argument in the first case on the oral argument calendar today, which is Columbia Snake River Irrigators Association v. National Marine Fisheries Service. May it please the court, my name is James Buechel. I'm here for the irrigators, and I propose to leave two minutes for rebuttal. I thought I'd start off touching on a jurisdictional issue that may have not been adequately briefed. Seven years ago when I stood before this court pursuing some of the same issues as to which we've been attempting to get to the merits for a dozen years, I was told that it's not proper to challenge the contents of a biological opinion or defects in the jeopardy standard of the science issues in the context of challenging the action agencies. Now I stand before the court having challenged the biological opinion, and the Justice Department tells me I should have sued the action agencies. They raise an issue as to whether we were harmed because this is a no jeopardy opinion. Our complaint outlined in paragraphs 5A through E the ways that we were harmed, and sworn testimony was submitted, which is in the further excerpts of record that I submitted at pages 15 through 17, which details how our injuries are redressable and how we have been injured despite the fact this is a no jeopardy opinion. And the way this has happened is that as part of sort of this wholesale dis-anchoring from the law, instead of following the statute which says we consult, if we find jeopardy, we can suggest reasonable and prudent alternatives. Instead of doing that, they have evolved a new process which consists of we consult, we find jeopardy, and then we work with you to update the proposed action so we won't find jeopardy. And that's sort of the new model. And the new model is we have these secret meetings with the sovereign parties which can't be recorded or tape recorded or documented in any way, and negotiations happen, and we come up with this new proposed action. And so I am here because the agency, the National Fisheries Service, has misused its authority. It has failed to discharge its duty to use the best science. It has grossly misinterpreted the jeopardy regulations in a manner that is calculated to extract and does extract money and operational changes from the operators. And so they are the root of the problem, and that is why I am here today suing them. Let me make this... How do you respond to their argument that you didn't raise any of these issues before the agency in the first instance? That's just not true. Well, I'll respond to that two ways. Number one, it's just not true. We did. We've been doing this for a dozen years. You'll see that in the affidavit. Number two, other irrigators raised many of these issues. Number three, this is not a public process. This is not a NEPA process. There is no authority anywhere of which I am aware. This would be the first case that says in an interagency consultation as to which there is no right of anyone to participate other than an applicant, and there are no applicants here. This would be the only case to ever hold that this process requires a comment in order to litigate, because it never has before, and presumably it never will again, because all the time these things pop out like Venus on the half shell. Here's the biological opinion, and environmentalists come and say, well, this is wrong with it, and this is wrong with it, because it's a private interagency consultation. But if Your Honor wishes, I can submit something after the oral argument that shows what we sent into the process. Well, you didn't address it in your brief, so I thought I would ask. Okay. Thank you. I thought I did, actually. I think I made reference to the notion that it was a private process that wasn't like NEPA, and the NEPA... Yes, I don't think you squarely met their argument. That's why I asked. Go ahead. All right. With respect to harvest, we have traced through the way the consultation process actually worked, and we find that very early on in the process, they recognized the issue that I'm now attempting to raise with harvest, which is that under the regulations, there's a baseline level of mortality. And the baseline includes future actions only if there has been a Section 7 consultation completed with respect to the project. And when it came to the harvest project, they said, well, we have some consultations that go out until the end of the year. There's no coverage in the future. And you'll find these statements in the record. And so it says, and I'll read it to you, we have not attempted to adjust these population trends to account for the theoretical cessation of adverse future federal actions that haven't undergone Section 7 consultation. This would decrease the needed survival change. So they project these very heavy harvests out into the future forever, and then they come up with an amount of benefit that they want to get, whether it's through money and mitigation or whether it's through changes in operations. And long about July 2004, they come up with a draft biological opinion that says, you jeopardize, and you have gaps, and here's what you must do. You must mitigate those gaps. And there's even a document called the Mitigating Effects of Operations document that tells them how to go about doing this. And as I said, this happens in July. And so this is all something that the agency is driving. It's using its determinative power. And when I say power, you know, it's important to recognize here that the Supreme Court has said, and I quote from Bennett v. Speer, the service is, to put it mildly, keenly aware of the determinative force of its opinions. So they understand that what they say goes. And as it says in the Bennett v. Speer opinion, if people don't listen to them, they can go to jail. And so we have a phenomenon where they say, this is what we need, and you must do it or else. And so it gets done. And so that's why I'm here, because of what is getting done. Now, the answer that the district court gave was, well, we can solve the once-on-harvest, and so that's good. But the project is an annual project. Fish numbers go up and down. Things change over time. And the project does not extend beyond December 31st, 2004. And what they're really doing here is they're saying, you, the dam operators, have to offset all future harvest. And that's just not fair, not reasonable, and not consistent with the regulations. It's just contrary to the regulations. And it also destroys the entire design of the dam. And it stands on its own bottom, so to speak. You have a federal agency action, we consider this. You have another federal agency action, we consider this. The idea that we take this tiny little private process and turn it into the whole recovery planning exercise is, in practical effect, a method of circumventing the entire recovery planning exercise, which is why 15 years or more after these listings, we have no recovery plan. We probably never will, because it's much more conducive to what they want to do, to make the dams pay for everything, and solve everything, and do everything, and then everything else is just like a little afterthought. That's not the design of Congress. And it leads to crazy results, which I'll turn to the second part of my argument, which is the crazy results of the science arguments. We have attempted to demonstrate for many years that small fluctuations in the flow of the mighty Columbia River do not have any measurable effect on salmon survival whatsoever. And after 15 years of science, some of the scientists are beginning to come out. And we've quoted extensively from the record the scientists saying, maybe what matters here is really temperature and not flow. And there's all these statements, you can't even estimate the relationship with flow, so forth and so on. So what does it come to? Simple one variable model, flow uber allis. And that's their model. And there's plenty of authority, which I've cited in the briefs, is if you're going to do a computer model, you can't leave out the one variable with explanatory force, and instead put in something that doesn't matter at all. And the answer to this is, well, I don't have to decide it. And it's moot. And there's something fundamentally wrong here when there can be two cases challenging the same biological opinion, and a legal error is found in one case, and the whole question of whether they're even in the right universe on the facts has been rendered moot. In essence, it allows the district court to say, I like that argument, and I don't want to consider all this. And there's no authority for this sort of thing anywhere. The closest analogy you have is sort of in the doctrine of abstention. And there's a whole lot of abstention law, which all starts with the fundamental proposition that you have to decide the questions that are before you. And as a practical matter, what has gone on here is, first, we were stayed, can't present the claims. Second, oh, the claims are moot. And then in the supplemental authorities, I sent you another decision from last week, where Judge Wren did the same thing to the Idaho irrigators. We're here, we'd like to raise this issue about the biology argument. No, I won't decide your issues. I'm just here to decide issues of environmentalists. And so all these things happen, and it's just not right, and it's just not fair, which brings me to another minor issue, intervention. We file our own case. The cases are consolidated. In the middle of oral argument, oh, well, the cases should be separate. So all right, we move to intervene, because there's an injunction essentially threatening to cut off our water. No, you can't intervene. You're too late. Well, as I put into the record, then months later, one month later, two months later, three months later, three other people come in and intervene, and if that's not an abuse of discretion, I don't know what is. So coming to the last argument, I guess there will only be one minute for rebuttal, the question of disqualification, we have been unable to get a fair hearing in front of this judge from the first day when we got a telephone call that, hey, you'll never guess what happened. Your case came up, and the judge said to the Justice Department, why don't you stay at this case? Well, I'm not there. What's going on here? And it's just been one thing after another. You know, you can do whatever you want, but you can't reconsider Jeopardy. You know, telling the federal government, you can't change the population trends. You know, hiring the harvest expert from the United States v. Oregon to advise on dams and then generating this giant record which is now under seal, and we have this situation now where what has been engineered is by the district judge is a situation where no one will ever know the basis for administrative action, because all these negotiations where the real decisions are made are all secret, no record is being kept, and by agreement, by formal agreement, which I've also put into the record, none of it can be used in litigation. So no one will ever know why the administrative decision was breached. Then when it comes to the judge, we have a whole separate record of facts and reports on this and memos on that and some giant pile of stuff that judge is off surfing the Internet to learn about breaching dams, and all of this is in the record, all of its transcript quotes, and so this Court can never even know how he decided the case because of this procedure. And I understand that people want to help the salmon and so forth and so on, but that's no excuse for not following the rules. And we ought to presume that if we follow the statutory design of Congress, maybe we just wouldn't be messing around with this thing after 15 years and still hopelessly entangled in a mess, and I'll say whatever I've got left for rebuttal. Thank you. Thank you, Counsel. Good morning, my name is Ellen Durkee. I'm with the U.S. Department of Justice. I represent the National Marine Fisheries Service in this and the next set of cases. I'm going to try to reserve some of my time for Mr. Mishuda with the National Wildlife Federation. Both cases before this Court today involved challenges to the analytic framework used by the National Marine Fisheries Service in rendering a no jeopardy determination on proposed operations of the Federal Columbia River Power System. In this case, the District Court judgment should be affirmed. The Columbia Snake River Irrigators Association do not challenge the no jeopardy determination rendered by NEMS on the proposed action. They challenge only how NEMS got to that conclusion, not the conclusion itself. And specifically, they criticize NEMS's scientific judgment in several respects, and they disagree with NEMS's assignment of adverse effects from harvest, either from tribal treaty rights or state harvest, either to the environmental baseline or cumulative effects, respectively. But the irrigators' real beef here is with the action that was proposed by the action agencies. They contend that it does more to benefit fish than would be minimally required by the Endangered Species Act. And this does create some kind of problem, you know, whether it's viewed as a jurisdictional problem or simply, you know, leading to harmless error. The situation here is that NEMS did not require the action agencies to propose this action, and their entire case is built on this premise that NEMS is the one requiring this. But the action agencies in this 2004 biological opinion put forth a proposed action, and that was what was found not to be in jeopardy or meet the jeopardy standards. So if you think it through, even if they could get NEMS to agree with them in the way they did their analysis or change their attitude towards science, the fact remains that this is a proposed action of the action agencies, and the fact remains it's a, you know, no jeopardy determination. If we reach the merits of their argument on the science, does the government have a position on whether temperature is statistically related in a significant way to fish population? Well, I think this issue both of temperature and flow are on the frontiers of science, and I don't think there is any, you know, I can say, oh, we have a certain position here, but I'd like to point out one thing, which is it's treated as if these are separate categories and exclusive categories. The reality is they're interrelated. If you have higher flows, you have lower temperatures. And so when NEMS has analyzed this in terms of flow, they're not completely ignoring temperature. It's basically a facet of flows also means that temperature is a part of that. And I think what the way they want to approach it is that they're, you know, sort of mutually exclusive concepts here, which they are not. But the, I think, to go back to this point. The government's position is that they are, you did take it into consideration in terms of, in terms of your flow analysis, and it did not merit an independent analysis. Their argument is that you did use a univariate versus a multivariate analysis, and that that was flawed because you eliminated a statistically significant factor. Your response is you didn't because that was taken in consideration of flow. And where does it say that in the biological? I think that's one response on the merits would be that. The other response is that they're, this is what they're challenging is the methodology. One of the models that was used as part of the analysis is not the only model that's used. I understand. And the idea that we, you know, that the only model that can be used is one that they suggest to be used is not the way administrative procedure is. No, I understand that. I just didn't understand your position on the actual merits of their science. Right. You know, I think there is a, such a wealth of scientific information, but the reality is that there are differing views as to the science and that there's still ongoing study and that the likelihood of everyone ever agreeing exactly on these issues is unlikely. And the way that the Administrative Procedure Act is set up and the act is set up, NMPS is basically the one that ultimately makes this call, and it is to their methodology that there must be difference to. In terms of, you know, going back to, I just want to touch on the tribal harvest issue for two reasons. One is to point out, sort of illustrate this point that I was saying is if they haven't sued the action agencies here, they've only sued NMPS, and what does that mean if you look at the issue they raise? They're saying you should exclude future tribal harvest from the environmental baseline. Well, if you did that, then yes, the environmental baseline would look less degraded, and that would provide an even stronger reason to uphold NMPS's no jeopardy determination. But excluding that harvest from the baseline would not change the proposed action that the action agencies put forward. So it's not going to change what they're complaining about. The other thing I'd like to say about tribal harvest is this. NMPS reasonably looked at this, much like they did consistently with the existence of the dams. Tribal treaty rights was a decision made long ago to enter into these treaty rights. It's a given decision. It is a decision of the past. These action agencies and NMPS cannot unilaterally change these treaty rights. And so just as the existence of the dams is a decision from the past that is part of the given context, one of the givens here is that there are tribal treaty rights. I just want to understand one thing with respect to tribal treaty rights, and that is the amount of take can vary, though. Isn't that correct? That is right. Is that negotiated every year, or is it set over a plan, a period of time, how much the take will be? And do the tribes voluntarily sort of hold back on the amount that they'll take after consultation? Well, it's complicated. No, let me try to explain it and not overly simplify it. But it takes place in the context of the USDA Oregon ongoing, and it is negotiated within the context of the different agreements are negotiated within the context of that lawsuit. There have been long-term agreements. Those expired. And since then there have been interim agreements. Some of them are annual. Some of them span several years. At this point in time, the agreement was entered in May of 2005, and it goes through the remainder of 2007. Now, one thing I'd like to point out, though, is the reason that those are subject to Section 7 consultation, the federal action, it's not the treaty rights themselves that need to be analyzed for Section 782 purposes. It's the federal agency's decision to enter into those settlement agreements, and it's the fact that those interim agreements also contain things that go beyond tribal treaty rights like state harvests. It's all negotiated as a package. And so that's sort of, you know, how it works. And it is in terms of the negotiation process, those are confidential negotiations within the context of U.S. v. Oregon and overseen by Judge King. One of the things I want to press on this court today is this is a complex problem, both technically, scientifically, and legally. And, you know, NEMSIS is taking regulations that are designed for every situation and applying them to the unique factors of this. In terms of tribal treaty rights, it's a given that there are tribal treaty rights. In terms of the quantification, NEMSIS wanted to make some kind of assumptions as to the amount. But it is true over time they may change. But the last point I'd like to make about that is that it's the restriction on the right that is actually being looked at in there. And if you follow the logical train of thought, if you can have no federal action here, then what the default position is there would be no restriction on that tribal treaty right. Okay, thank you. Thank you. Good morning and may it please the Court. My name is Steve Masciuto for the National Wildlife Federation, Appellees. I want to touch just briefly on the intervention issue and the court's denial of the irrigator's motion to intervene. The district court did not abuse its discretion in finding that the late filed intervention motion by the irrigators was untimely and prejudicial. It's kind of understandable that there might have been a misunderstanding as to the effects of the consolidation, right? I'm not sure that that's necessarily true, Your Honor. I think that misunderstanding is maybe based on the Schnabel case is what the irrigators have pointed to. And I think in that case this court made very clear that it was not addressing the issue of whether or not the Johnson decision which predated Rule 42 was wiped out by that rule and specifically recognized, but it had vitality in other contexts and that case on its facts is much different than what we're dealing with here. It's also difficult to square, you know, no abuse of discretion with the court at a later time permitting others to intervene. How do you square that? Well, the other parties that the court let in after denying the motion for intervention from the irrigators all expressed, well, there were three of them. First, the State of Montana who had participated in this case as amicus since the beginning. It made clear in its motion that it was only seeking to intervene for purposes of any future proceedings, not to appeal or to re-litigate the merits phase of the case. The golf course that was allowed to intervene also intervened only for purposes of the preliminary injunction to protect an interest it felt was threatened. And then the Kootenai tribe of Idaho also, like the State of Montana, intervened only for purposes of future relief. Here, the irrigators are very clear both in their district court papers and in their briefs on appeal that they sought to intervene not only to participate in the preliminary injunction phase, which they were allowed to do regardless, but also to appeal any ruling on the merits to this court. Did anybody ever suggest that the parties file a consolidated complaint after the cases were consolidated? No, Your Honor. That was never suggested. In fact, after the cases were consolidated, they each had separate briefing schedules. They proceeded along those tracks, and really, we only met at oral argument where the court. So were they simply low-numbered and related together, or were they actually consolidated where they were merged together? I don't believe they were merged, and I think the district court made that clear at oral argument that the consolidation order did not affect. What was the purpose of consolidation, just to have it before the same judge? I think it was because they were challenging the same final agency action and to have oral argument on this. It was more like they were related cases, then, rather than consolidated cases. Perhaps that might be true, in as much as they challenged the same final agency action, and they were assigned to the same district judge. Is there a written order of consolidation? There is, Your Honor. I believe from the date is March 1st, and it's a minute order. I believe it's probably two or three lines long that basically. March 1st, okay. March 1st, 2005. I'm sorry. I'll look for that. Thank you. And then just briefly, the court's denial of intervention is not, as the irrigators alleged here today, somehow indicative of a bias against the irrigators or the arguments that they seek to present. In fact, all the arguments that the irrigators have made to this court to support recusal of Judge Reddin have all been made twice now and twice rejected by the chief judge of the district court, and they presented nothing new on this appeal. It was not an abuse of discretion for the chief judge of the district court to deny that motion below, and we have no different arguments or new evidence to support overturning that. Thank you, counsel. We'll give you two minutes for rebuttal. With all due respect to the Justice Department, their system has appellate attorneys who don't participate at the trial level, and they're not as familiar with the record as they might be. It is not true that they took temperature into account. They started off with a simple model that had neither flow nor temperature. As a political matter, down in the Portland office, they developed these single variant models, which I put graphs in from the brief, and they tacked those on to find these gaps in survival, which explained nearly all of the gaps that there were. At the same time, the scientists up in Montlake were saying there's only one year that makes any relationship at all, and it's temperature that's doing it. There is no issue that has been more studied than this. People have been fighting about this for 15 years, and it is pretty conclusively settled that it is temperature, not flow, that matters, at least in the main stem, which has enormous amounts of water in it. It's essentially zero water, zero survival. Then as long as they can swim through, there's an enormous range over which it doesn't matter at all. The second issue I'd like to touch on is this is not a case about tribal harvest at all in some fundamental sense. The biological opinion that I have put that is in the record, which is projected out into the future, this 30% kill rate on these fish forever, essentially, is an opinion on all of the in-river harvest, which is tribal, non-tribal, sport, recreational, commercial. It's all there, and the allocation decision about what the tribe's rights are is something that occurs after someone has decided what the harvestable surplus of fish is. They are completely distinct decisions. All that the Fishery Service does in terms of the Flying Endangered Species Act is say, this is how many you can kill, not how many each person gets to kill. That's a purely political compromise developed in the United States versus Oregon in secrecy, which is now regrettably becoming the model for dam operations, which is one of the things we're trying to prevent from happening. With respect to intervention, there is nothing in Rule 42 that says consolidation is not murder. Consolidation is consolidation. There is no merger rule. We moved to consolidate. They were consolidated. You can consolidate for different purposes. Right, but no one thought about it. There's a Circuit Rule 15-3.2, which deals with… Your challenges were a little bit different than the challenges… But they're to the same… Right, but they were different challenges, correct? You asserted different grounds. Yeah, that's true. But they didn't identically overlap. Isn't that right? Well, they identically overlapped with respect to the particular tiny subsets of the Endangered Species Act that were at issue, but the factual areas of them did not overlap. At the time these cases were consolidated, do you remember whether, I mean, did Judge Redden make any particular remarks about the meaning or effect of consolidation? No, it was… He said the motion to consolidate is granted or something like that? There wasn't any argument. We just sent it in. It might have been by stipulation. I don't remember. We sent it in. It's stamped, and everything was fine until the middle of oral argument when one of these guys, well, he can't argue about our case, which I thought was a little odd. He had already filed briefs in his case. The reason I'm asking, I'm sure there's some law on it, but nobody really discusses what we could call the law of consolidation. I mean, there's a rule. I'm sure there are cases under the rule as to what consolidation means. But nobody argues. You certainly don't make the argument about his later interpretation of it as being contrary to any existing case law. There is a hole in the case law and a split of authority, and this Court has not resolved it. What I suggest is that this Court look to its own Circuit Rule 15-3.1 or 2, I can't remember, which is how you handle appeals from Bonneville. And it says when you've got a bunch of people coming in on the same Bonneville action, they're all automatically consolidated, and they're all deemed intervenors in each other's case, so you don't have any confusion or problems or wasteful procedural wrangling. That's the problem, though, you see. I mean, the rule under which your motion was made in Granite is not that specific. That's correct. It's just Rule 42. It just says consolidate. It doesn't say for what or for how, and I assume they were consolidated for all purposes. Usually, you know, I'm only speaking about my own experience, which is when I remember when I wanted to consolidate cases and I wanted to merge for all purposes, I would tell little parties to file a consolidated complaint. No one ever suggested that either? All claims are merged and you have a single new complaint and everything is filed under one number? I've heard of that. It didn't seem... Other times you consolidate cases for purposes of oral argument and, you know, have everybody in court together at the same time and deal with everything at the same time. We did, I should say for Judge Tshishima's benefit, that the last time around this did come up and we presented our claim to consolidate and the Earth Justice said, well, we don't want consolidation  and I think I cited that in the brief. And so I assumed it was, you know, I can argue in his case, he can argue in my case, I filed briefs on the preliminary injunction issue and then we get to oral argument and, well, now the cases are going to be separated. I mean, it's... I don't know how to... No, but the agency model really is sort of the way it happened in this case because in a petition for review from agency action, there can be multiple petitions for review. We generally consider them in a consolidated hearing or one hearing, but they're separated still for assessment purposes. I mean, I don't think we've ever treated a consolidation order as allowing intervention in the various petitions for review. A good example of the FERT cases we have here, which are 185, 200 cases, and we did take a few of those, but we did not allow intervention except by order in all of the others. And that happens as a matter of routines. Monoble Power, we crafted a separate rule for that because of the administrative problem. But that's for us to figure out, I guess. Anything else you want to quickly add? No, that's it. I think the papers adequately deal with the disqualification issue. It's quite lengthy and intricate. Thank you. Thank you. The case just heard will be submitted and we'll proceed with the argument on National Wildlife Federation versus National Marine Fisheries Service. Thank you. Again, this is Ellen Durkee. With me at council's table is Clay Smith, who's the Deputy Attorney General of the State of Idaho, and Mark Ames, who's with the Office of General Counsel for NOAA Fisheries. Before I turn to the five issues that are on appeal, I'd like to step back because there are a few things that I think need to be understood here. The pervasive theme of plaintiffs, and echoed by the district court, is that the NEMS and the action agencies, and some abrupt about faith, are improperly ignoring the impact to listed species caused by the existence of the dams. That is simply not true. And some of the things that I want the court to be sure to understand are these. First, the 2004 biological opinion and the proposed action is an improved version of the reasonable and prudent alternative that was found not to jeopardize in the year 2000. So contrary to some of the suggestions of otherwise, this is actually an improved version of the action that was found not to jeopardize. This action includes both improvements to the hydropower system itself and non-hydro improvements and mitigation. And it's an improvement in part because the mitigation efforts are more, there's more clarity and commitment to those, and one of the things that Judge Redden had found inadequate in 2000 was the lack of certainty of implementation. The other aspect of this is the action agencies have undertaken very significant activities to improve the hydropower system in terms of its impacts on listed species. Just, and there are many examples, but one of them is this ongoing implementation of putting in removable spillway wares or other surface collector systems. These are very expensive systems to design, and they do create significant impacts in increased juvenile salmon survival down the river. The other thing is the federal agency as a whole spent hundreds of millions of dollars per year on salmon recovery efforts. The second point is that the ENEMS analysis does take into account impacts of the, that come from the existence of the dams. And the analysis that they use, I just want to run through it briefly, because where National Wildlife Federation presents it,  and therefore implied that this wasn't taken into account. What NEMS did in this was compare the proposed action to a reference operation only to define the effects of the action. It teases out the effects of the dams, and so you get a definition of what the effects of the action is. That is not the end of the analysis as they suggested. What NEMS, the next step in the analysis is then to determine the significance of those effects in light of a degraded baseline, including effects of the dam. And that occurred here, despite their suggestion that it did not. And the third point, sort of an overview point that I'd like to make, is that it's very important in looking at this particular Section 7A2 claim to remember that the Endangered Species Act must be read as a whole. And it is designed as a whole system in order to bring listed species back to a point of not only survival but recovery. And Section 7A2 was not the only mechanism that Congress developed to do that. In particular, under Section 4F, the recovery planning process is what Congress designed to be the main mechanism to reach recovery of species. You also have Section 7A1, which imposes on federal agencies an obligation to take conservation measures within their authorities. And you have Section 9, which prohibits take of species. And in that regard, I do agree with Mr. Buechel that what is happening here is this expectation that this 17A2 consultation process is going to be a substitute for the entire recovery planning process. And that's not what it's designed to do, and in biased terms, that's not what it does. Now, turning to the particular issues on appeal, the first issue is what is the scope of the action? And I'm just going to touch on that briefly. But the only question there is whether the existence of the dams themselves is part of the action. To the extent that the district court thought otherwise or that the plaintiff suggests otherwise, that is not the case. The only non-discretionary element that we're talking about that was excluded in terms of defining the scope of the action was the existence of the dams. And as I think I'll briefly lay out in detail, if you go to the statutory language of what actions are included, the definition of an action, those that are funded, authorized, or carried out by agencies, if you look at the regulations, if you look at the consistent practice here, the existence of the dam has never been considered part of the action itself. How do you separate out the existence of the dam from the operation of the dam? Okay, conceptually, how it was done here was to devise the reference operation is an analytic tool to do precisely that, to tease out the effects of the existence of the dam from the operation. And the way they did that was to say if these dams were operated solely for the benefit, the only purpose was to operate them for benefit of fish, what would the effects be? What would that operation look like and what would the effects be? And then to take the proposed action and compare it to that. Because what you're left with is a surrogate, a reference operation is really a surrogate for saying this is what the, in the present configuration of the dams, this is the unavoidable impact of the existence of those dams. But as I understood from the bios, that that surrogate method, that it's recognized that the ideal operations will never be achieved or can't be achieved. I mean, they're only a construct. It's just a. It is a construct. Almost like a fiction. Well, it's a conceptual approach, which is what you do often, you know, in these modelings. You know, even models cannot be achieved. And so it's a modeling technique. And, you know, the reason, you know, it can't be achieved is because of, you know, if you operate it that way, I think that, you know, there would be effects that would be on that. But in terms of, I think the question was conceptually how do you do that. That is conceptually how you do it. All right. And it's, you know, it's an attempt to sort of, if you will, what is typically done in these cases, try to define what the no action would be in a situation where it's very hard to say we're not going to do anything. It's typically very easy to say, oh, no action means, you know, start on this process. It is hard when, you know, if you're going to be. Well, I appreciate that. You have to operate the dams. So, but the important thing, I think, and I'm going to move on because I think that our briefs do lay out why the dams are not part of the action and on to the segregation issue. And what I'd really like to underscore is that the tag lines that are being used to describe the analysis here are inaccurate. You know, you can't just simply say, oh, it's a comparative analysis so it's improper. There was a comparison made as one of the steps in the process, but it didn't just end there, and it was not a comparison between what we did last year and what we did this year, and if we did better this year, then per se it's no jeopardy. That was the argument that industry made in Alcoa, and NEMS said, no, that's not right there, and NEMS continues to say that's not right. But once you have defined the effects of the action, what NEMS did here, and which is abundantly apparent in the biological opinion, is that they said, okay, now we've defined what the effects of the action are, what does this, how significant are these in light of the condition of the species, in light of the status of the species under the baseline, in light of whether the biological requirements of the species are being met. Is this an appreciable reduction in the likelihood of survival and recovery? And, you know, they did it for each species, and if you look at those descriptions, you see a very thorough analysis of their status. You find the words that they claim right there, that there is a tolerance for some short-term adverse effects given the status. And overall, over the term of this action, this 10-year term of this action, for most of the species, it is actually not a net change over the term of the action, and in some cases it's a net benefit over the term of the action. And a lot of this comes from the removal of spillway wares that I mentioned before and implementation of these mitigation efforts that do take some time for implementation. On the recovery issue, the point, again, I'd like to underscore here today is that the Gifford-Penchot case actually lent a great deal of support to the argument that we're making here. Gifford-Penchot goes through the statutory analysis as to why recovery is an inquiry for the critical habitat inquiry. But that same analysis means it's not a part of the inquiry in terms of the Jeopardy analysis here. And what the district court has done here, in our view, is it's requiring this completely separate and independent analysis that is over and above what the Jeopardy standard requires. It's unprecedented. These kinds of very broad brush holdings of the district court really call into question, not just the biological opinion here, but a lot of biological opinions, because what he's suggesting isn't done, typically. And so that the, again, goes back to recognizing that the Section 72 process is not a substitute or a surrogate for recovery planning process. And the recovery planning process is ongoing. I don't agree with Mr. Buechel's description that it will never end. There was a precursor to the recovery plan that was issued in 2000, which was a recovery strategy. It envisioned as the next step doing sub-basin recovery planning in collaboration with local and state sovereign entities and tribal entities. It allows for public notice and comment. And those sub-basin plans are proceeding. They're different ones that have been put into the Federal Register for comment. And so that process is continuing. And then I guess the last issue that I'd like to make sure I touch on today, and that is the issue of the remand order and the structured remand. The plaintiffs would have you believe that the aspects of that remand order to which we're objecting are simply ways of keeping us on schedule and just sort of ordinary commonplace remand orders. That's not what's going on here. What's going on here is an intrusion into the decision-making process, the substantive decision-making process, the extent to which the collaboration has to touch on different issues, and the sort of complexity which with this is, you know, evolving into the constant bickering in court as to whether enough collaboration is going on and so on and so forth, I think has to be understood to understand why we're objecting to this. There is a policy working group on the remand. There are 12 technical working groups. There are objections from non-sovereigns as to their role in participation in this. I think ironically, National Wildlife Federation went to the judge and said, you know, even though they wanted a one-year remand period, they are the ones who have gone and asked for an extension because they want this collaboration process to take place, and they weren't satisfied with the degree in which it's happening. As I understand the remand order, though, to the extent that the judge ordered consultation, you know, or to have them write the new plan, or it was just simply, as I understood it, to hear them out. Well, and we would appreciate this court saying that because I'm not sure all the parties would agree with your view of that. The other, but I think the other piece. I wouldn't agree, but they recognize. I mean, it's ultimately the agencies that write the plan or NIMS that signs up on this. Right, but the entire process is designed to influence it as it's going on, and I mean the failure report requirement is an example of that. To have NIMS policing the action agencies as to what they want to put together as a proposal and then take to the court other options, including breaching the dams, which none of these agencies have authority to do, I think is indicative of the kind of pressure that is trying to be brought to bear here. And, you know, I think the case law is so consistent on this issue, and the Supreme Court recently reversed an en banc decision in this court in Gonzales v. Thomas to underscore that when there's been legal error found in an agency decision, the remedy is to send it back. The court cannot order what is to happen. And that is what we need to process. We didn't order a particular result. We were faulted in Thomas because we went ahead and decided the issue. Right, but it goes beyond just the particular result here. Neither the Endangered Species Act or the Administrative Procedure Act require these kinds of procedures, nor, and if they don't, aren't required, then a court does not really have authority to impose these kinds of procedures on the remand process. I think you indicated that the remand process was ongoing, right? Yes. During the course of the appeal. Where does it stand now? There have been two status reports, and where it stands now is that the action agencies are still in the process of developing a new proposed action, so it hasn't gotten to the point of having a proposed action that would go to NIMS. Has there been any failure report? No, there has not. The, I just think what's going on here is impressive, and I would just mention that in the 20-J letter I sent in, the American Rivers decision last week, I think, is also indicative of the degree to which Judge Redden wants to get involved in these cases. What happened there is Judge Redden actually fully ruled in favor of NIMS in saying these are separate actions, they're not independent, they're not, you know, there's no reason you have to do a buyout together, but then states at the end, but I'm going to order, you know, a consolidated collaboration, a consolidated remand, I guess, with this case. And, you know, another order is going to be forthcoming in terms of the instructions of that. But, you know, even when you don't have the violation to then say, but I'm going to start a process here, I think is of a great deal of concern here. This is something that we may have, and Judge Redden continually reminds us of consequences. So it is coercive in that sense. He said the consequences you're going to have to consider removal of the ban, the consequences you may be held in contempt, consequences that I may withdraw the, you know, the biological opinion and then you'll all be liable. So it is a concern here, and I'd like the Court to take that. I just want to go back. I just have one minor question. When you were talking about the scope of the action and the baseline and the comparison, one thing I was trying to understand is you put the existence of the dams in the baseline, and then other, I think what happened here was like irrigation, power generation and whatnot also gets put in the baseline. I was trying to understand how you draw a distinction between discretionary and non-discretionary acts that make it into the baseline. Okay. Irrigation, for example. You say you have to provide for irrigation. There are two kinds. Isn't there a certain amount of discretion that goes along with having to provide for irrigation? There is, but the reason that is in the baseline, or most irrigation, I mean there's two kinds. Why is it characterized non-discretionary? That's my second question. Okay. There were six irrigation projects that were put into the baseline, and the reason it was characterized as non-discretionary. I don't mean to be particular on irrigation, but I mean there were several items. And I want to get back to where I was, but let me just explain that. Because of the contract obligations. The one thing I want to say about that, they've really never objected to those particular irrigation projects. It's never been an issue. It's never been mentioned by Judge Redden. And NEMS ran the analysis without them in the baseline. So, frankly, I think those are a non-issue. The other reason some of those categories are put into the baseline is because of the regulation that says federal actions that have had a Section 7 consultation on them already automatically go into the baseline. So, even though those activities do have discretionary elements on them, they were actually the subject of a prior biological opinion. It is a system under the statute of first come, first served. And once you have a federal decision, you have a biological opinion on it, it automatically goes into the baseline. But then you also have this category of givens that's an environmental baseline that isn't even necessarily federal actions. It could be any, you know, as I mentioned before, it could be the tribal treaty rights. It could be the dams. The decision on the dams were made, you know, Bonneville Dam was built in 1938. The Endangered Species Act wasn't looking to say, should we take that out? Should we consult on whether we're going to build the Bonneville Dam? And so, and you can say that about, you know, development, human and various development. You know, it's given. It's there. And the Endangered Species Act is not to say, oh, let's try to look at, you know, everything out there and consider that part of the action. Okay. Very good. Good morning, Your Honors. I'm Todd True. I represent the National Wildlife Federation at Palis in this appeal. I'll be dividing my time with the state of Oregon this morning. I'll take 15 minutes, and the state of Oregon will take five. And I'll focus my attention on the refugee framework issues. I will also try to address briefly the recovery and remand order issues. Before I turn to my argument and start the same way counsel for the government did by stepping back, let me respond very quickly to just a series of points that came up that the government made in framing the argument. First, the government asserted that the RPA, or that the action in the 2004 biological opinion, is really an improved version of the RPA from the 2000 biological opinion. As this court recognized in the prior appeal, though, that RPA itself was found to cause jeopardy. And in the 2000 biological opinion, that led the agency to go out and sweep in mitigation from various other sources that the court found too uncertain to count. And so the assertion that we don't have a problem here because the action in the 2004 biological opinion builds on an action that didn't cause jeopardy doesn't wash. Second, counsel explained that, in fact, the government is always taking steps to fix the effects of the dams and has added removal spillway weirs and various other things. The takeaway point from that, I think, is that all of those are structural modifications to the existence of the dams. The idea that the government is powerless to do anything about the existence of the dams doesn't wash. And, in fact, the government has been told by Congress, specifically, to mitigate for the effects of both the existence of the dams and their operation on salmon. That's in section 4H8A and 4H10A of the Northwest Power Act. Those provisions are cited and quoted in the tribal amicus brief. Third point, the government says that the analysis in this biological opinion doesn't end with the comparison of the reference operation and the proposed action. And what it is citing to is chapter 8 of the biological opinion. What chapter 8 says is, where there are no net effects, there is no jeopardy. We're going to tell you about these other factors. I believe that the phrase on page 8-1 is to provide the full context. There is not an analysis of the action in its specific context that adds the effects of the action to the baseline and cumulative effects to make a jeopardy determination. What you have is that comparison and then you have it carried forward. And if you look at chapter 8, you won't find the analysis that you find in say the 1995 or the 2000 biological opinion that looks at the action in its context. Finally, the government argues that we somehow view chapter 7, section 7 of the Endangered Species Act as swallowing the rest of the Endangered Species Act. We do not. Section 7 has a particular purpose. The critical point here is that its purpose is not to simply preserve the status quo or to check in on the status of the species as it gradually declines and make sure that a government action is not making it worse today and then if it's worse five years down the road, be sure that the next government action is not making it worse then. Section 7 is aimed at avoiding or ensuring against jeopardy and jeopardy is a fundamental biological concept. And so let me turn to those issues now. I think it's important to start thinking about this appeal from a perspective that Judge Marsh noted a decade ago in the IDFG case. He said the ESA is focused on the needs of the species. Its purpose is to halt and reverse their decline whatever the cost, as the court said in TVA. And so the interpretation and the application of the act in all of its provisions, including section 7, has to be informed and guided by that goal. What Judge Marsh went on to explain is that the agencies have tended to focus not on the needs of the species but on parsing and slicing and dicing their actions. And that is in fact what has happened again in this biological opinion, unlike the biological opinions in 1995 and 2000. In fact, we in the government agree that the jeopardy decision is made for a proposed federal action. We disagree about how that decision is made and that's a new disagreement because whatever the government says about this biological opinion, in 1995 and again in 2000, it framed the question that it had to address in the terms that the statute set and that focused on the needs of the species. It asked how can we structure and operate the hydro system and ensure that we don't jeopardize the continued existence of species given the existing impacts from the hydro system. That's a very different question from the one they posed in 2004. They asked how can we parse our action so that we can calculate our share of the harm if we isolate and compare some of the effects of operating the system to another set of operations. And I think it's important to go look at page, I believe it's 5-6 of the biological opinion because there the government says very clearly what we have done is compared two sets of operations and the differences between those operations, the differences are the effects that we have to consult on. So, at some abstract sense, it may be true that the existence of the dams is in both the reference operation and the proposed action, that is those effects. But what the government did is like an equation where all the terms that are the same on each side of the equal sign cancel each other out and all that's left is the difference. And that's what they said we have to decide whether that causes jeopardy or not. It is not the approach that the regulations describe and that Judge Redden's decision says has to be followed here. It's not the approach the agencies followed in 1995 and 2000. And I think this Court's recent decision in the PCFSA versus BOR case makes it very clear that the question for the government is not how do we avoid our share of jeopardy, it's how do we avoid jeopardy. How do we take an action and leave the species in a condition that it has the capacity to survive and recover? In fact, the PCFSA case I think was an even harder one than this one because there the additional harm that the Court that needed to be addressed in order to avoid jeopardy was caused by non-federal actions. It was caused by private irrigation. Here, the harm that goes into the analysis in the baseline primarily from the construction and operation of the dams, that's all from federal action. And we know also that these agencies have been given direct authority from Congress to mitigate for the effects of both the development and the operation of the hydro system on salmon. So there is no reason in either the ESA or elsewhere to try to slice out some piece of the action and say we're only going to focus on that. I think the point here is that in looking at whether an action causes jeopardy, the question, the way to frame it is to say Section 7 prohibits that action unless there is room for that action without causing jeopardy to the species. So if that room exists below the jeopardy threshold, the federal action can go forward. But if there isn't room below that threshold for the whole action to fit, then the agency is going to need to impose enough mitigation or carry out or conduct enough mitigation for the action to proceed. And if it doesn't do that, then it gets a jeopardy determination for its action. And then it can either not take the action or proceed with exemptions or whatever. So the government is just wrong when it says the approach that the district court required and the approach the statute and regulation requires, requires it to right all wrongs. That's a phrase out of their reply brief. It only requires the government to right enough wrongs so that its action can go forward without causing jeopardy. And it's wrong when it says that because it has no authority to remove the dams, the effects of the dams have to be factored out of the jeopardy analysis. If it's never actually explored in a complete way whether its authority to mitigate for the development and operation of the dams can provide a set of actions, structural, operational, and so on, that would avoid jeopardy. It tried to do that in 95, and when it came back and looked at what it had come up with in 2000, it said, well, that actually caused jeopardy. In 2000, it said the RPA alone causes jeopardy. We've got to sweep in this other stuff. We have never actually had the agency step up and say, if we exercised our authority fully, could we avoid jeopardy? They have always taken a different turn. And the key question under Section 7 is, what kind of action can we go forward with now? With what mitigation in order to avoid jeopardy? That's the exact question that the regulation posed. The effects of the action added to the effects of the baseline and any cumulative effects in order to determine whether and how federal action can proceed. Let me just mention very briefly the issue of limiting the consultation to discretionary operations. I think the district court has made it very clear, and we've just talked about the Northwest Power Act, that really we have never bumped up against the limits on the agency's discretion to operate this system. And to the extent the agency is saying, well, the limits of our discretion are we can't take out the dams, that limit hasn't actually come into play. And I think the problem for the agency is that the regulation they want to rely on in saying, as they do on page 5-6, the only thing we're going to look at is the difference between these two operations and that represents our discretionary action. The problem they run into is that the regulation that uses the word discretion, it's not designed to define the scope of consultation. It's designed to determine whether consultation is triggered at all because there is some federal action that's going on there. And here no one has ever argued that the operation and configuration of the hydro system is not an action that requires consultation. None of the cases that the government and Idaho cite on this issue about there being a discretionary limitation do what they say they do. And I think this Court's recent decision in Defenders of Wildlife v. EPA makes that very clear because it walks through each one of those decisions and addresses that argument. Is this regulation a limitation on the scope of consultation to discretionary actions? And it says it's not. It says the Ground Zero case is not. What happened in Ground Zero is that there was full consultation on every aspect of the federal action. It's just that the citing decision was made by the President and so it was not a federal action by definition. Let me turn briefly now to the recovery issue. And I think the thing that I want to start out with on that point is that the District Court made clear and we have made clear that a jeopardy analysis that addresses recovery is not about what does it take to achieve recovery. It's about whether this action that is being proposed will avoid an appreciable reduction in the species prospects of recovery. And the regulations make it very clear that recovery is a component of the jeopardy analysis. I think the clearest thing is the statement in the preamble to the regulation that says effects on recovery alone can cause jeopardy. I believe the precise words are effects on recovery can also cause jeopardy. And in fact, I think in their reply brief, unlike the arguments here today, the government has shifted its ground to argue that, well, it did address recovery in this biological opinion, but the fact is it didn't because it addressed it at best implicitly and this Court has said in PCFSA that that's not adequate. And if you look at, if you just, there are excerpts of the 2000 Biological Opinion in the excerpts of record and that opinion said we've got two different components here. We've got a survival standard. It's a high likelihood of survival. A recovery standard. It's a moderate to high likelihood of recovery. We have to assess how far we are from that and how much this action is going to throw us off track and that's how we determine whether there's jeopardy. We've got to look at both of those. I think the argument that recovery doesn't count really attributes to the drafters of the regulation defining jeopardize the existence of a cynical attempt to mislead because they put the words survival and recovery in that regulation and if recovery could never be relevant, if what they really meant was an appreciable reduction in survival or if they really meant it's a two-strike game, somebody would have said that. Somebody would have come up with that before now and if you look at the consultation handbook, if you look at the agency's habitat paper for salmon and if you look at those biological opinions, you don't see that. Recovery is an element of a proper jeopardy analysis and the district court operation included that. Let me just very briefly mention the remand issue. I think the key issue here is that the district court has set procedural sideboards on this consultation. The district court did not direct the agency to set up a policy workgroup. It did not direct the agencies to set up 14 technical workgroups. It just said you've got to talk to these people and you've got to report to me. The structure that we have now, which is admittedly complex and which may well produce some good results, is one that the agencies set up and they set it up talking to the people that the court asked them to talk to but you can't fault the court for that agreement. The court set procedural limits on the remand and those limits are appropriate under the Alaska Center case, under the Federal Power Commission case that we cite in our brief. I think a critical thing to remember here is that even if these procedural requirements move towards the limit of the court's discretion, the court made findings here that there was a real need for some guidance in this remand and nobody has challenged that. If the agency has gone back to the court and said we don't want to participate in this working group, we don't want to have these working group kind of things, we're willing to listen to what they have to say but we don't want to have this working group operation. Your Honor, in fact, if you go back, there are probably the quarterly reports that the government has filed in the remand have touted how encompassing and engaged and participatory the remand process is, how transparent it is. Obviously, there's disagreements around in there but it's been look at how great we're doing and here's the process we've set up. So they haven't gone back to Judge Brennan and said look, they're interfering, this is all interfering with our decision-making capability. They have asserted that various particular activities go too far, whether the plaintiffs can sit in on meetings as observers or whether, I can't recall, but those have all been resolved and the court, and they have not been resolved by the court. The court hasn't stepped in and said you've got to let these observers in the room. In fact, the court has made it clear that it really doesn't want to deal with those kinds of issues. Now, I think, and it's appropriate, that the risk the government runs if it goes back to the court and says we don't want to do any of this stuff, we're going to go off in our own corner and write a biological opinion, then there is a risk that they will follow an approach that doesn't take account of the scientific issues that the tribes and the states legitimately are trying to raise and they come back with one that doesn't work. There is absolutely an equal risk that they will come back with one that perfectly complies with the law and we have been clear in our briefs and I will be clear here, we do not think the district court can tell the agency substantively what to do in the remand. That's not what the court has done. So the court's remand order is perfectly appropriate and let me just say that in sum, this opinion is a sharp departure from past biological opinions. It's based on an improper jeopardy, a comparative jeopardy analysis on improper attempt to limit consultation to discretionary effects and improper exclusion of recovery and the district court correctly rejected those approaches. This court should affirm the district court's decision. Thank you. With 39 seconds instead of five minutes. No, we'll put five minutes on the clock.  Thank you, Your Honor. May it please the court, David Leith, representing the state of Oregon. Just to take up the last point first, all parties did agree and told Judge Redden that a regional collaboration was an essential part of what a successful remand would look like and all parties to that remand agree that it's going well.  that it was a mistake. Thank you. Thank you. Thank you. Thank you. And certainly the parties to the remand and NIMS and I would say that Judge Redden also has been very clear that he understands that the responsibility for the biological opinion ultimately is NOAA's, NIMS, and the biological opinion will be the agency's work product, not the work product of any of the other parties to the collaboration. I'd like to take up briefly the questions about the teasing out the existence of the dams and whether that's feasible. I would suggest that teasing out the existence of the dams is really a fool's errand and I'd offer four reasons for that. First, as I said, it is technically infeasible. Second, it's fraught with likelihood of underestimating discretion and this current biological opinion provides an excellent example of that. The current biological opinion and the reference operation that supposedly exercises all available discretion for the benefit of fish does not include the implementation of removable spillway weirs which the federal attorney mentioned was an important aspect of the mitigation proposed in the biological opinion. There's acknowledged discretion to implement those weirs. There's no question that they're a positive thing for fish yet the reference operation, the reference action, did not include those removable spillway weirs as part of what is expected of the action agencies. And fourth, that likelihood of underestimating the agency's discretion is exacerbated by the fact that the agency hasn't purported, NIMS hasn't purported in the biological opinion to account for the agency's and this court's decision in Defenders versus EPA acknowledged that the ESA itself can be a source of some discretion for an agency to act for the protection of listed species. And finally, the exercise is primarily of teasing out the existence of the dams is primarily of academic interest if a proper jeopardy analysis is done where one takes into consideration the full baseline as part of the jeopardy analysis. So as I said, I think that it's a futile and useless exercise to try to tease out the existence of the dams. I guess I want to sum up at this point already. Oregon does agree that the most far-reaching issue on this appeal, and all of the issues are important, but the most far-reaching is the validity of NIMS' new taking the jeopardy analysis where in effect, NIMS wants to look at as long as the agency's proposed mitigation as part of a self-contained package for the proposed action, NIMS is willing to look at the proposed action with its mitigative and its adverse effect to look at it in isolation to determine whether that in isolation pays for itself as it goes. And the ESA is not a pay-as-you-go system for analyzing the impact of proposed federal agency action on protected species. This court's decision in the Pacific Coast Federation of Fishermen's Association, mentioned by Mr. True, is clear on that point. NIMS analyzed the federal agency, the Bureau of Reclamation's share of responsibility for the plight of the protected climate basin coho salmon, said that the agency's responsibility was 57%, and therefore required the agency to provide 57% of the solution, and this court said no. The ESA isn't about making sure that in isolation the agency action has paid for itself. The ESA is about protecting species, about saving species, and in order to be true to the mandate of TVA versus Hill, that the protection of species has been made the highest priority and the requirements of Section 7 are as plain as can be, this court should require NIMS to properly analyze Jeopardy to take into consideration the context in which the federal action occurs. Thank you. We'll put five minutes on the clock. Your Honor, there's three quick points I'd like to make on rebuttal. First, the characterization of the 2000 Biological Opinion, we differ with the National Wildlife Federation's characterization of that. What NIMS did there was judge the significance of the action in the context of the recovery strategy, and the recovery strategy included actions by all others. It did not, as they keep suggesting, they keep inflating it to say that those other activities were necessary to avoid Jeopardy, but what happened is really that provided the context. A similar thing happened in the 2004, but what the NIMS did was to tether more closely to what the regulations actually said. They took the significance of the action and took it in the context of the environmental baseline. Second point I'd like to make in terms of this issue of how much analysis of recovery and whether additional analysis of recovery potential is required here. As we explained in our reply brief, I'm not backing off on what we said in the reply brief at all. The potential for recovery is an aspect of survival. You have to have survival and sufficient abundance of productivity in order to have the potential for recovery, otherwise it's not survival. But that, the action, the potential for recovery is clearly not undermined by this proposed action and therefore extensive discussion beyond that, which is already in the biological opinion, is not required, and that's error to require that. The third point I'd like to make is to return back to this, the difference in views of the plaintiffs and us beyond this aggregation issue. A couple points I'd like to make about that. One, how NEMS applies this regulation is an issue into which they're entitled to absolute highest level of deference. They are their regulations and therefore it's not sort of simply a what do we all think would be best here. Secondly, instead of focusing just on what was done here, I'd like to focus on what they consider would be the preferred approach. Because that approach is really reached a very absurd result and is fraught with difficulties. What they've explained in their brief, which they did below, is they're saying that there's some kind of objective jeopardy line here. And once you've reached that line, all federal activities must stop unless you mitigate at such magnitude that you take care of all the baseline issues and or you go to the committee. Now there's a couple things to think about here. First of all, all of these species in a vernacular sense are in jeopardy. They wouldn't have been listed if in a vernacular sense they were in jeopardy. What we're looking at is a statutory term of art to jeopardize the continued existence of. And it is defined in terms of a relative inquiry. It's defined in terms of avoiding an appreciable reduction in the likelihood of survival and recovery. So I think you have to let go of the idea that there's some absolute thing that we all would agree, that's the jeopardy line, you know, you can't go above or below. But even using that conceptually, two points. One, here, the biological opinion does talk in terms of there being tolerance for additional risk. So if you want to go to the resource cushion idea, well that tolerance is here, it was defined here explicitly. But secondly, with their idea that all federal agency action must stop unless it's significantly mitigated. I think it might be one of those situations, be careful what you ask for because you might get it. Here's, they admit in their brief that that means even actions that have no net adverse impact or even have beneficial impact would be prohibited. Prohibited and beneficial impacts on species. You can't go forward unless you do something very dramatic. So how might that be applied? Well what if the action agency says, we want to use our conservation authority and we want to improve habitat for species and we're going to fund or do ourselves, take out hanging culverts which prevent species from going upstream into different tributary areas. Well that's going to have to go into consultation because you do that kind of construction, you're going to get sedimentation, you're going to get some adverse impacts. Overall it's going to be beneficial because you're going to open up enormous tributary areas for spawning. So you couldn't do that under their theory if as they claim we're already at this jeopardy place. You couldn't do that because unless you fix the whole system. And that's absurd and that is not what Congress intended and that's not what the regulations intend. That is why it is rational to focus on what the effect of the action is itself. And if it is not reducing appreciably the likelihood of survival and recovery, then it is not jeopardy and it should go forward. Thank you counsel. The case is heard and will be submitted. Thank you all for your arguments and briefs and we'll be in recess at one. Alright.
judges: Tashima, Thomas, Paez